IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ROGER D.,

          **Plaintiff,**

  v.                              Civil Action 1:23-cv-00040
                                  Magistrate Judge Kimberly A. Jolson

COMMISSIONER OF
SOCIAL SECURITY,

          **Defendant.**

## OPINION AND ORDER

Plaintiff, Roger D., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB"). The Court **OVERRULES** Plaintiff's Statement of Errors (Doc. 10) and **AFFIRMS** the Commissioner's decision.

**I.    BACKGROUND**

Plaintiff filed his application for DIB on November 26, 2019, alleging disability beginning April 15, 2019. (R. at 330–33). After his application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a telephone hearing on December 3, 2021. (R. at 193–221). The ALJ denied benefits in a written decision on December 16, 2021. (R. at 79–107). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the Commissioner's final decision. (R. at 1–7).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on January 24, 2023 (Doc. 1). The Commissioner filed the administrative record (Doc. 7), and the matter has been briefed (Docs. 10, 11).

**A. Relevant Hearing Testimony**

The ALJ summarized the reports presented to the administration and testimony from Plaintiff's hearing:

> [Plaintiff] testified his daily activities involve sitting up for a few minutes before getting out of bed, showering using a shower chair to prevent falls, letting his dog out, watching TV, making himself breakfast, washing laundry, spending time outside with his dog to keep his spirits up, and performing light chores, such as picking things up around the house (Disability Hearing). He testified his wife and daughter wash the dishes, and his daughter grocery shops. In contrast to his testimony that his daughter has told him that he is forgetting everything, his function reports reflect his statements that he does not require special reminders for personal care activities/grooming, medications or appointments and his impairments have not affected his ability to handle his finances, including paying bills (Disability Hearing; Exhibits 3E, 6E).
>
> Notably, while the March 2020 function report reflects [Plaintiff]'s statements that he could follow written instructions sometimes, follow oral instructions like an average person, and pay attention for 15-20 minutes at a time his October 2020 function report reflects his statements that he could follow written instructions very well, follow oral instructions fairly well, and pay attention for 60 minutes at a time (Exhibits 3E, 6E). While [Plaintiff] alleged in both function reports that he cannot complete tasks, he does not specify whether this issue arises from physical health issues, mental health symptoms, or both (*Id.*). Regardless, the totality of the evidence does not support his allegations, especially considering his statement to the pulmonologist that he sometimes does not go to bed until 10 AM because he goes fishing and the generally normal physical and mental status examinations in the medical records (Exhibit 6F; See Exhibits 2F-4F, 6F, 10F, 13F-16F).

(R. at 87).

> [Plaintiff] testified his daughter lives nearby and she comes over almost daily (Disability Hearing). He testified he lives with his wife with whom he is going through a separation/divorce, his depression and anxiety have affected his interactions with others because he can no longer go hunting and fishing, which were the activities he engaged in with a lot of his old friends, with whom he has now lost touch, and he gained new friends through social media, but he does not spend time with them in person. Based on his statements to his pulmonologist in August 2019 and the consultative psychological examiner in July 2020, he was still enjoying fishing during the alleged period of disability (Exhibits 6F, 7F). [Plaintiff]'s testimony that he has been able to establish new friendships and that his daily activities include talking to his friends on the phone (they call and check up on each other) reflects greater ability to interact with others than alleged and no more than moderate limitations in this broad area of mental functioning.

(R. at 88).

> [Plaintiff] alleged disability due to chronic syncope, dizziness with falls, left ear hearing loss, OSA, depression, anxiety, difficulty standing and lifting objects from the ground, inability to bend forward or tilt his head backwards without dizziness/falling, problems with focus and memory, and thoughts of self-harm (Exhibits 2E-4E, 6E, 8E; Disability Hearing). He testified he had three operations in his left ear due to a tumor, with residual hearing loss. He testified he does not know how much hearing loss he has, but he has very low amount of hearing. He testified he has not been recommended to use a hearing aide. He testified he has OSA and currently weighs 262 pounds. [Plaintiff] testified he has tried different combinations of medications to treat his syncope, but only one medication slows it down (Northera, but it doesn't stop the episodes). He testified the syncopal episodes occur without known triggers, and he can sometimes feel lightheadedness and dizziness when engaging in activities and he can prevent a blackout if he sits or lays downs quickly enough. He testified that bending over, looking down, or looking up causes him to feel very dizzy and he sometimes falls. He testified he has had to "baby proof" his house because of his several falls. He testified the falls are from losing his balance. [Plaintiff] testified he could stand for no more than 5-10 minutes and he had two tilt table tests and could stand for less than 5 minutes before blacking out at a tilt of 5 degrees. He testified he could stand still for about only 5 minutes, and he could stand 10-15 minutes if he shifts his weight. He testified he could lift 10-20 pounds if moving an object from one counter to another, but he cannot bend over to lift an object. He testified he does not drive because "it was suggested" that he doesn't drive and he doesn't want to take that risk. He testified his dizziness, lightheadedness and fatigue associated with syncope occur daily and the blackouts occurs 2-3 times a week on average and can occur 1-5 times a week. He testified he regains consciousness within 5-10 seconds and remains disoriented for usually 2-3 minutes afterwards.
>
> [Plaintiff] testified he takes medications for depression and anxiety and that when he told his doctor the medications did not help at all, his doctor told him that he was taking the highest doses his doctor could prescribe and, therefore, his doctor recommended therapy. [Plaintiff] testified the therapy clinic was only taking walk-in appointments secondary to the COVID pandemic, and he made three trips to the walk-in clinic, but it was closed each time secondary to being under-staffed and the doctors not being able to make it to the clinic. [Plaintiff] testified he tried to seek help outside of medication because he was already on psychiatric medication "before this started" and his symptoms are progressively worsening.

(R. at 90–91).

### B. Relevant Medical Evidence

The ALJ also discussed Plaintiff's medical records and symptoms:

3

The longitudinal evidence of record shows [Plaintiff] has a history of neurocardiogenic syncope (vasovagal syncope), which was diagnosed in February 2018 after a tilt table study (Exhibit 2F). The echocardiogram in February 2018 and the cardiologist's physical examination in May 2018 were essentially normal (*Id.*). Dr. Keller clinically noted in May that he had increased [Plaintiff]'s fludrocortisone acetate (Florinef) dose at the last examination, which provided [Plaintiff] significant relief with his syncope, as [Plaintiff] denied having any syncopal episodes or cardiac complaints and he reported that he was able to sit and stop the symptoms from causing syncope (*Id.*). Dr. Keller maintained [Plaintiff] on the same 0.1 mg daily dose and instructed him to follow-up in six months (*Id.*). [Plaintiff] reported increased symptoms in July 2018 and midodrine 2.5mg, three times daily was added to his regimen (*Id.*). Jamie Fyffe, CNP clinically noted that [Plaintiff] was medically cleared to return to work in three days if he had no recurrent symptoms (*Id.*). Based on [Plaintiff]'s earnings records, his AOD, and Dr. Keller's January 2019 cardiology follow-up records, the new medication regimen effectively controlled his syncope episodes (Exhibits 3D, 2F).

The [ALJ] notes that prior to following up with Dr. Keller in January 2019, [Plaintiff] was following up with his primary care physician Alan Noel, MD about his neurocardiogenic syncope and Dr. Noel was adjusting his medication (Exhibit 1F). Nevertheless, [Plaintiff] reported to his physicians in November 2018 and January 2019 that he had not experienced any syncopal episodes for a while (Exhibits 1F, 2F). Both physicians instructed [Plaintiff] to continue taking Florinef three times weekly, and in January 2019, Dr. Keller advised [Plaintiff] that he needs to at least take midodrine 5mg twice daily (Exhibit 2F).

\*\*\*

[Plaintiff] informed Dr. Noel on April 15, 2019 that he was instructed not to return to work because someone witnessed a syncope episode, but he stated he was told to increase Flourinef to one tablet daily and continue taking midodrine daily, and that he was taking two midodrine tablets daily (Exhibit 4F). However, as previously mentioned, in January 2019, Dr. Keller instructed [Plaintiff] to take Fourinef three times a week, not daily (See Exhibit 2F). Additionally, Dr. Keller's treatment records noted he instructed [Plaintiff] to take midodrine at least twice a day, but he and [Plaintiff] agreed they were not going to make any changes to his medication regimen and the regimen at that time was for midodrine three times daily, based on the July 2018 follow-up treatment records (*Id.*). As such, it is reasonable to conclude that Dr. Keller was advising [Plaintiff] not to take any less than two of the three prescribed pills of midodrine daily. This is important as Dr. Noel clinically noted [Plaintiff] need to increase midodrine to 3 times daily if he was still experiencing symptoms (Exhibit 4F).

[Plaintiff] returned to Dr. Keller on May 1, 2019 complaining of increased syncopal episodes, and he reported that the increase in midodrine and Florinef severely

increased his blood pressure, so he stopped taking Florinef (*Id.*). Dr. Keller instructed [Plaintiff] to remain off Florinef, but he increased the midodrine dose to 10 mg, three times daily (*Id.*).

Dr. Noel thought it was prudent to put [Plaintiff] back on his prior daily dose of Florinef and three times daily dose of midodrine and referred [Plaintiff] to a new cardiologist, with whom [Plaintiff] sought examination on May 20, 2019 (Exhibits 3F, 4F). The new cardiologist, Dr. Lam, ordered a stress cardiac MRI and a three-week Holter monitor, which both essentially evidenced normal findings, and he clinically noted the EKG showed normal sinus rhythm (Exhibit 3F). He found [Plaintiff] had decreased pedal and posterior tibial pulses bilaterally (+1) on examination in May, but the remainder of the physical examination was normal (*Id.*).

*** The [ALJ] finds that the clinical treatment does not support [Plaintiff]'s testimony. As previously stated, Dr. Keller's and Dr. Noel's prior records documented the effectiveness of Florinef and midodrine in significantly reducing the syncope and presyncope episodes. Dr. Noel's May and June 2019 follow up treatment records also continued to document subjective reports of improvements (Exhibit 4F). Dr. Lam's clinical records show he continued to prescribe those medications, as he referred [Plaintiff] for diagnostic tests, to the ENT for evaluation to rule out any inner ear problems, and for a home sleep study (See Exhibit 3F). Dr. Lam did not start [Plaintiff] on samples of Northera 100mg, three times daily, until July 15, 2019 (*Id.*). At the follow up examination two months later, [Plaintiff] reported that his near syncope/syncope episodes, which had been occurring every 3-5 days, had markedly decreased to two episodes a month (*Id.*). He stated the symptoms mostly occurred when bending down or standing up too quickly and denied palpitations prior to any episodes (*Id.*). Dr. Lam added the prior dose of Florinef to the Northera regimen, in light of the reported symptoms, and advised [Plaintiff] to bend down and stand up slowly (*Id.*). He also advised him to start using the CPAP, diet, exercise, and stop drinking sweet tea (*Id.*).

While the primary care and cardiology records document prescriptions for the above three medications, Mathew Cosenza, DO's ENT follow treatment records from June 2019 to June 2021 contain medication refill records showing [Plaintiff] last filled midodrine on December 10, 2018 and no evidence that he filled Florinef or Northera (Exhibits 14F, 15F; See Exhibits 2F, 4F). Those records also show [Plaintiff] filled his psychiatric medications, along with other medications in 2019, 2020, and 2021 (Exhibit 14F).

***

Although Dr. Lam had added Florinef back on to [Plaintiff]'s neurocardiogenic syncope treatment regimen in September 2019 and he provided [Plaintiff] a 90-day prescription with one refill, Dr. Noel's clinical notes from November 2019 do not

5

reflect [Plaintiff]'s reported use of Florinef (Exhibits 3F, 4F). Instead, it notes that Dr. Lam increased the Northera dose, which is inconsistent with Dr. Lam's records

(*Id.*).

At the July 2020 consultative psychological examination, [Plaintiff] reported he was taking Northera, bupropion, citalopram, trazodone, propranolol, and omeprazole, indicating that [Plaintiff] never contacted Dr. Lam for medication refills of Florinef, despite having continued neurocardiogenic symptoms (Exhibits 7F).

Although the record shows he decided to take only one medication to treat the neurocardiogenic syncope (Northera), his May 2021 Cigna Disability Questionnaire documented his reported use of Northera 100 mg was only once a day, when he has been prescribed that medication to be taken at a dose of three times a day since July 2019 (Exhibit 15F; See Exhibit 3F, 4F, 10F, 13F, 15F, 16F). Furthermore, Dr. Noel's September 2021 follow-up treatment records documented [Plaintiff]'s statements that he noticed his neurocardiogenic symptoms were worse when he ran out of Northera for two months (Exhibit 16F). However, he reported that he experienced increased syncope only twice a week without the use of this medication (*Id.*).

In addition to Dr. Lam's clinical records showing the effectiveness of Northera in alleviating syncope when taken as prescribed, Dr. Noel's clinical records shows Northera provides greater relief than alleged; the primary care records continued to note [Plaintiff] had syncope and presyncope episodes 2 to 3 days a week, but he would go two weeks without any episodes, and those episodes became more infrequent, as he was having syncope every 5-6 days to having syncope and presyncope every 7-10 days (Exhibits 10F, 13F, 15F, 16F). Dr. Noel's clinical treatment records noted [Plaintiff] treats with Dr. Lam, he was working as an operations manager at Target distribution center, and that "he was told he could go back any time as [sic] well as [sic] he is doing better" (Exhibits 4F, 10F). This clinical notation likely explains that lack of cardiology examinations with Dr. Lam after September 2019.

Aside from obese weight, and intermittently slightly high blood pressure, Dr. Noel's clinical treatment records reflected normal physical examination findings and mostly normal mental status examination signs (Exhibits 4F, 10F, 13F, 15F, 16F). He clinically noted [Plaintiff] had past examinations with a neurologist, but the medical evidence of record does not contain neurology examination records. There is an EEG that was performed in May 2020, which was normal and showed no epileptiform discharges or other paroxysmal activities (*Id.*). A brain MRI from 2020 was unremarkable (Exhibit 15F). \*\*\*

The primary care records also documented denials of regular exercise and the recent treatment records also documented weight gain, which is inconsistent with his

6

>diagnoses of obesity, OSA, hypertension, hyperlipidemia, GERD, and prediabetes, for which Dr. Noel consistently medically advised [Plaintiff] to diet, engage in regular exercise, and lose weight (Exhibits 4F, 10F, 13F, 15F, 16F). In September 2019, [Plaintiff] admitted he was drinking copious amounts of sweetened tea and he had not started on his CPAP (Exhibit 3F).

(R. at 91–94).

### C. Relevant Medical Opinions

In evaluating the relevant medical opinions of record and prior administrative medical findings, the ALJ determined:

>The [ALJ] considered the opinions of the state agency medical consultants and finds their opinions are not persuasive, because aside from opining that [Plaintiff] could never climb ladders, ropes or scaffolds and should avoid all exposure to hazards and commercial driving, the remainder of their assessment are inconsistent with the totality of the evidence, when considering the combination of [Plaintiff]'s impairments and the fact that the clinical treatment records continued to document complaints of syncope and near syncope episodes several times a week with use of northera (Exhibits 2A, 4A; See Exhibits 3F, 4F, 10F, 13F, 15F, 16F). Consistent with [Plaintiff]'s testimony, the cardiology records discussed above documented [Plaintiff]'s statement that bending over and standing up too fast exacerbated his neurocardiogenic symptoms (Exhibit 3F). When erring on the side of caution, given [Plaintiff]'s use of multiple medication and nonprescription treatments, reducing his exertional, postural and environmental functional limitations even further is reasonable, especially in light of his obesity, cardiac, and other impairments.

>The [ALJ] considered the medical source statement completed by Dr. Noel in April 2021 supported [Plaintiff]'s long-term disability application, whereby he advised [Plaintiff] to avoid high places where there is increased risk of falling, and to avoid working on or near heavy equipment or large machinery due to increased risk of accidents and injuries due to syncope (Exhibit 15F). The [ALJ] finds Dr. Noel's medical restrictions are persuasive, because the bases for his restrictions are reasonable and consistent with the symptoms arising from [Plaintiff]'s neurocardiogenic syncope and near syncope documented in the primary care and cardiology records.

>\*\*\*

>The medical evidence of record contains clinical notations that [Plaintiff] cannot return to work as long as he continues to have syncopal episodes, but this appears to be documentations of [Plaintiff]'s statements to his physician (Exhibit 4F). However, Dr. Noel provided him with work notes to allow time off work and extended his time off work, and Dr. Noel noted his opinion in May 2019 that

7

> [Plaintiff] needs to be on short-term disability, as well as his opinion on [Plaintiff]'s long-term disability application in April 2021 that he needs to remain off work for at least another two months (Exhibits 4F, 15F). The [ALJ] finds these portions of the medical evidence of record inherently neither valuable nor persuasive, as issues of disability/inability to perform past relevant work are reserved to the Commissioner (20 CFR 404.1520b).

(R. at 98–99).

### D. The ALJ's Decision

The ALJ found that Plaintiff meets the insured status requirements through December 31, 2024, and has not engaged in substantial gainful activity since April 15, 2019, his alleged disability onset date. (R. at 84). The ALJ determined that Plaintiff suffered from the severe impairments of neurocardiogenic vasovagal syncope; history of cholesteatoma of the left ear, status post-mastoidectomy and three inner ear reconstructive surgeries with titanium silicone implant; history of tympanoplasty of the left ear, status post-bilateral myringotomy and ventilating tube insertions (as a child); obstructive sleep apnea (OSA); mid-wall fibrosis of nonischemic myocardial disease with preserved left ventricular function; obesity; depressive disorder; and anxiety disorder. (R. at 85). Still, the ALJ found that none of Plaintiff's impairments, either singly or in combination, meets or medically equal a listed impairment. (R. at 86).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

> [Plaintiff] has the residual functional capacity to light work as defined in 20 CFR 404.1567(b) except he requires an entry level job involving simple routine tasks that is nonfast-rate production, defined as involving no conveyor belt or assembly line work and no hourly quotas. [Plaintiff] cannot function as a member of a discrete team but can work in proximity to co-workers and supervisors, with contact largely superficial. Occasionally in direct interactive contact with the public; in a "low stress" environment, defined as one having only occasional changes in the work setting. Job responsibilities may be performed with the turning of the torso or the head. Fine audio acuity is not required to perform job responsibilities. Can lift and/or carry 10 pounds frequently, and 20 pounds occasionally (from very little up to 1/3 of an eight-hour workday). Can stand and/or walk (with normal breaks) for 4 hours in an eight-hour workday. [Plaintiff] requires the opportunity to stand for 15 minutes at one time before needing to sit for 2 minutes before resuming standing,

> so long as he is not off task. Can sit (with normal breaks) for 6 hours in an eight[-]hour workday. Can perform pushing and pulling motions with the upper and lower extremities within the aforementioned weight restrictions for two-thirds of an 8-hour workday. No more than occasional overhead reaching with the upper extremities. Needs to avoid hazards such as moving machinery and unprotected heights, but does not need to avoid hazards typically found in the workplace such as boxes on the floor or ajar doors. No commercial driving. Job responsibilities do not include the use of sharp objects such as knives or box cutters. Job responsibilities do not include the use of hand-held vibrating or power tools. Needs to be restricted to a work environment with good ventilation that allows the individual to avoid frequent concentrated exposure to extreme heat, extreme cold, and high humidity. Can perform occasionally: climbing stairs with handrails, stooping, crouching, kneeling, and crawling, but needs to avoid climbing ladders, scaffolds, and ropes.

(R. at 89–90).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." (R. at 91).

The ALJ found Plaintiff unable to perform his past relevant work as a warehouse floor supervisor. (R. at 100). But, relying on testimony from a Vocational Expert ("VE"), the ALJ determined that Plaintiff is capable of performing other work in the national economy such as a garment sorter, job merchant or inspector and packager, along with sedentary exertional jobs such as a document preparer, jewelry bench hand or lens inserter. (R. at 100–102). Consequently, the ALJ concluded that Plaintiff is not disabled. (R. at 102).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### III.  DISCUSSION

Plaintiff alleges the ALJ erred in making an RFC determination that was not supported by substantial evidence by finding Plaintiff could perform light work but failing to include "appreciable limitations." (Doc. 10 at 13–14). In particular, Plaintiff emphasizes his need for unscheduled breaks, off-task time, and measured postural changes. (*Id.* at 13–15). The Commissioner counters that no doctor opined that Plaintiff needs unscheduled breaks or off-task time, that the medical opinion Plaintiff cites to regarding postural limitations is vague, and that the ALJ supported his RFC finding with substantial evidence. (Doc. 11 at 1).

A plaintiff's RFC is an assessment of "the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1) (2012). The Social Security regulations, rulings, and Sixth Circuit precedent provide that the ALJ is charged with the final responsibility in determining a claimant's residual functional capacity. *See, e.g.*, 20 C.F.R. § 404.1527(d)(2) (the final responsibility for deciding the residual functional capacity "is reserved to the Commissioner"). And it is the ALJ who resolves conflicts in the medical evidence. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir.

10

1984). Substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).

When determining the RFC, the ALJ is charged with evaluating several factors, including the medical evidence (not limited to medical opinion testimony) and the claimant's testimony. *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004)). The RFC assessment must be based on all the relevant evidence in Plaintiff's case file. 20 C.F.R. § 416.945(a)(1). "Ultimately, 'the ALJ must build an accurate and logical bridge between the evidence and his conclusion.'" *Davis v. Comm'r of Soc. Sec*, No. 2:19-CV-265, 2019 WL 5853389, at *5 (S.D. Ohio Nov. 8, 2019), *report and recommendation adopted*, No. 2:19-CV-265, 2020 WL 1482318 (S.D. Ohio Mar. 27, 2020) (quoting *Waye v. Comm'r of Soc. Sec.*, No. 1:18-CV-201, 2019 WL 364258, at *5 (S.D. Ohio Jan. 30, 2019), *report and recommendation adopted*, No. 1:18CV201, 2019 WL 718542 (S.D. Ohio Feb. 20, 2019)).

Here, the ALJ determined that Plaintiff had the "residual functional capacity to perform light work." (R. at 89). In the RFC, the ALJ included, in relevant part, that Plaintiff: could perform job responsibilities that involved the turning of the torso or head; could stand and/or walk (with normal breaks) for four hours in an eight hour workday; required the opportunity to sit for two minutes after standing for fifteen minutes while remaining on task; could perform pushing and pulling motions with the upper and lower extremities within weight restriction parameters for two-thirds of an eight-hour workday; and could occasionally reach overhead with the upper extremities. (*Id.*). Plaintiff contends the nature of his syncopal episodes—that he will drop to the floor without warning two to three times weekly and often needs to sit or lie down for several minutes afterwards because of dizziness—confines him to an RFC that includes greater restrictions including

11

unscheduled breaks, off-task time, and measured postural changes. (Doc. 10 at 14).

The ALJ's role is to determine the RFC based on an evaluation of medical and non-medical evidence. The ALJ discussed Plaintiff's relevant medical record, including the record related to Plaintiff's syncopal episodes. (R. at 90–95). The ALJ highlighted that Plaintiff was first diagnosed with vasovagal syncope in February 2018, and that he was put on medication which "provided [Plaintiff] significant relief with his syncope." (R. at 91, citing R. at 466–468, 470). The ALJ considered evidence that Plaintiff's medication was adjusted multiple times as his symptoms fluctuated and he experienced side-effects, but also that Plaintiff was noted, at times, as not taking his medication as prescribed. (R. at 91–94, citing *e.g.*, R. at 459–460, 463, 468, 484, 513, 516). The ALJ considered that when taking his medication as prescribed, treatment records consistently showed a reduction in Plaintiff's syncope and presyncope episodes. (R. at 92–93, citing R. at 445, 453, 463, 468, 470–471, 488, 500, 504, 507, 525). And clinical records showed Northera, first prescribed in July 2019 by Dr. Lam, was effective in alleviating Plaintiff's syncope when taken as prescribed, with the ALJ noting at one point Plaintiff went from "having syncope every 5-6 days to having syncope and presyncope every 7-10 days." (R. at 93–94, citing 488–489 ("Where [he] previously experienced near syncope, syncope every 3-5 days, he now experiences 2 episodes per month."), 500, 664 ("Symptoms seems to be worse since he ran out of Northera.")). The ALJ also noted that Dr. Lam advised Plaintiff to bend down and stand up slowly since Plaintiff reported his symptoms as occurring when he bent down or stood up too quickly. (R. at 93, citing R. at 488–489). The ALJ additionally considered Plaintiff's history of unremarkable findings on an echocardiogram, a stress cardiac test, a three-week Holter monitor, an EKG, an EEG, a brain MRI, and various physical examinations. (R. at 92–94, citing R. at 459–461, 476, 483–484, 498–499, 517, 564, 585, 617, 628–629, 636–639, 642–643, 644, 671).

12

The ALJ further considered the opinions of the state agency medical consultants, finding them unpersuasive because they were "inconsistent with the totality of the evidence." Namely, the ALJ concluded that the opinions did not go far enough as to Plaintiff's exertional, postural, and environmental functional limitations given his syncope and near syncope episodes "several times a week" even with the use of medication. (R. at 98–99, citing R. at 227–228, 236–237). The ALJ also considered a medical source statement advising Plaintiff to avoid high places and working with heavy equipment, finding the statement persuasive because of Plaintiff's neurocardiogenic syncope. (R. at 99, citing R. at 611). Notably, neither the consultants nor the medical source statement opined that Plaintiff needed unscheduled breaks, off-task time, and measured postural changes. (R. at 227–228, 236–237, 611).

In addition, the ALJ considered Plaintiff's testimony about his syncope. (R. at 90–92). The ALJ considered Plaintiff's testimony that "he has tried different combinations of medications to treat his syncope, but only one medication slows it down (Northera, but it doesn't stop the episodes)." (R. at 90, citing R. at 202). The ALJ also noted that Plaintiff said though his syncopal episodes occur without known triggers, he can "sometimes feel lightheadedness and dizziness when engaging in activities and he can prevent a blackout if he sits or lays down[] quickly enough." (R. at 90, citing R. at 202–203). And the ALJ considered Plaintiff's testimony and subjective reports in treatment notes that his symptoms associated with syncope "occur daily and blackouts occur[] 2-3 times a week on average and can occur 1-5 times a week" but that Plaintiff "regains consciousness within 5-10 seconds and remains disoriented for usually 2-3 minutes afterwards." (R. 90–91, citing R. at 209–210; *see also* R. at 459, 468, 482, 498, 507, 516). The ALJ also made note that Plaintiff said he "cannot bend over to lift an object" and that he can stand for ten to fifteen minutes if he shifts his weight because of dizziness. (R. at 90, citing R. at 203–204, 205, 382).

13

The ALJ reasonably read the record as not supporting the additional limitations Plaintiff wants. As described above, the ALJ understood Plaintiff's syncope episodes as ongoing, even when controlled by medication, and considered the symptoms associated with them. (*See e.g.*, R at 96 ("[E]ven when considering the ongoing episodes of syncope and presyncope with the use of the prescribed medications, the residual functional capacity adequately and reasonably addresses the episodes and the associated symptoms and signs."), 97 ("When considering his testimony and the clinical treatment notes regarding the syncope and presyncope triggers . . .")). The ALJ crafted Plaintiff's RFC accordingly to include limitations related to Plaintiff's postural, movement, and environmental needs. (R. at 89–90).

Significantly, neither Plaintiff's treating physicians nor the state agency consultants opined that he specifically required either unscheduled breaks or off-task time. And unlike what Plaintiff alleges when he maintains that "the ALJ's residual functional capacity assumes [Plaintiff's] episodes would occur outside of the parameters of his workday[,]" the ALJ questioned the vocational expert about how much off-task time employers would tolerate during an eight-hour workday when applied to a hypothetical person with Plaintiff's RFC. (*See* Doc. 10 at 15; R. at 218). The vocational expert testified that in an eight-hour workday, employers would tolerate up to 10% off-task behavior. (R. at 218). Plaintiff testified that he experiences "blackouts" two to three times per week for about five to ten seconds, and it takes him only two to three minutes to reorient. (R. at 209–210). Mathematically, the ALJ was reasonable in concluding that Plaintiff's off-task or break time resulting from his syncopal episodes would fall at or below 10% of an eight-hour workday. For both of these reasons, the ALJ was under no duty to impose or consider imposing such limitations in Plaintiff's RFC and accurately portrayed Plaintiff's physical and mental impairments in his hypothetical questions to the vocational expert. *See Ealy v. Comm'r of*

14

*Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010) ("The physicians who treated Ealy for these things never recommended *any* ongoing significant restrictions."); *cf. id.* at 516 ("Although the ALJ posed an alternative hypothetical . . . the court ultimately rejected the factual basis for this alternative hypothetical and incorporated the first hypothetical into its RFC finding. In reality, [the state agency psychological consultant's] assessment falls somewhere between the two hypotheticals.").

More still, although Dr. Lam advised Plaintiff to practice "conservative measures such as slowly bending down and slowly standing up" in response to Plaintiff's self-reported difficulties with the movement (R. at 489), the ALJ was reasonable in interpreting this statement as too vague to be either a specific functional limitation or a medical opinion. *See* C.F.R. § 404.1513(a)(2) ("A medical opinion is a statement from a medical source about what you can still do despite your impairment."); *see also Howard H. v. Comm'r of Soc. Sec.*, No. 2:20-cv-4932, 2022 WL 765217, at *4 (S.D. Ohio Mar. 14, 2022) (finding that a physician's opinions on limitations would not "support any further reduction in" an RFC because they were not "stated using vocationally relevant terms" (internal quotation omitted)). At any rate, it is unclear how the exclusion of a limitation in Plaintiff's RFC to perform more measured postural changes by avoiding standing too quickly after bending down prejudices Plaintiff, as Plaintiff does not specifically allege such harm, nor did he cross-examine the vocational expert about this limitation during the disability hearing. (*See* Doc. 10 at 14–15; R. at 219–220); *cf. Sims v. Comm'r of Soc. Sec.*, 406 Fed. Appx. 977, 982 (6th Cir. 2011) ("Yes, the vocational expert's testimony could have been further refined; but as the district court pointed out, plaintiff's counsel had the opportunity to cross-examine, but . . . did not probe the deficiency now identified on appeal.").

Ultimately, the ALJ supported his RFC finding with substantial evidence. The ALJ considered both medical and non-medical evidence, including Plaintiff's testimony about the nature of his syncopal episodes, and fashioned an RFC based on the record as a whole. This is what the ALJ was supposed to do. *See Henderson*, 2010 WL 750222, at *2; *Berry*, 2010 WL 3730983, at *8.

At base, Plaintiff wishes "the ALJ had interpreted the evidence differently." *Glasgow v. Comm'r of Soc. Sec.*, No. 2:15-CV-1831, 2016 WL 2935666, at *7 (S.D. Ohio May 20, 2016), *report and recommendation adopted*, No. 2:15-CV-01831, 2016 WL 4486936 (S.D. Ohio Aug. 26, 2016), *aff'd*, 690 F. App'x 385 (6th Cir. 2017). But the law prohibits the Court from reweighing the evidence and substituting its judgment for that of the ALJ. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995) ("This court reviews the entire administrative record, but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ."). All said, the ALJ's findings were within the "zone of reasonable choices," and his RFC determination was supported by substantial evidence. *See McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Rogers*, 486 F.3d at 241.

### IV. CONCLUSION

Based on the foregoing, it is **ORDERED** that Plaintiff's Statement of Errors (Doc. 10) is **OVERRULED** and that judgment be entered in favor of Defendant.

IT IS SO ORDERED.

Date: December 12, 2023              /s/ Kimberly A. Jolson
                                     KIMBERLY A. JOLSON
                                     UNITED STATES MAGISTRATE JUDGE